**In re VERMONT REAL ESTATE INVESTMENT TRUST, Debtor.**

**Bankruptcy No. 82–33.**

United States Bankruptcy Court, D. Vermont.

Aug. 19, 1983.

David Putter, Montpelier, Vt., for Steele Associates, Inc. and Elizabeth Gentile.

W. Wyman Smith, Burlington, Vt., for debtor.

Douglas J. Wolinsky, Burlington, Vt., for creditors' committee.

William A. Fead, Burlington, Vt., for shareholders' committee.

William B. Gray, Rutland, Vt., for Margaret L. Baird.

Jerome F. O'Neill, Burlington, Vt., for The Howard Bank as Administrator of Estate of Thomas Sawyer.

Eugene Wermer, Trustee.

## MEMORANDUM AND ORDER

CHARLES J. MARRO, Bankruptcy Judge.

Vermont Real Estate Investment Trust (VREIT) as debtor in possession, and its Shareholders Committee, gave notice under Bankruptcy Code Section 363(b) of an intention to sell real estate with improvements, as follows: (1) real property located at 267–271 Pearl Street, Burlington, Vermont; (2) real property located at 1306 Ethan Allen Drive, Colchester, Vermont.

The matter came on for a hearing after notice. No objection was made to the sale of the Pearl Street Property. However, Jerome F. O'Neill, Esquire, appearing for the Howard Bank as Administrator for the Estate of Thomas Sawyer, Douglas J. Wolinsky, Esquire, appearing for the unsecured creditors committee, and William B. Gray, Esquire, appearing for Margaret L. Baird, objected to the sale of the Colchester property on the ground that the Colchester sales agreement between VREIT and Terre Enterprises (Terre) serves the interests of the VREIT equity security holders at the expense of the unsecured creditors. They supported this position by comparing the terms of the Terre purchase offer with the terms of a purchase offer by one Mr. Kaushal (Kaushal), which offer was rejected by the VREIT trustees.

The terms of the two purchase offers are as follows:

IN THOUSANDS

| | | Terre | Kaushal |
|---|---|---|---|
| 1) purchase price | | 725 | 725 |
| 2) less: broker's fee | 50 | | 65 |
| 3) fix-up costs | 0 | | 20 |
| 4) costs of sale (2) + (3) | 50 | | 85 |
| 5) net proceeds of sale | | 675 | 640 |
| 6) less: advance to mortgagee | 510 | | 562 |
| 7) financing by VREIT | 165 | | 0 |
| 8) total paper (6) + (7) | | 675 | 562 |
| 9) net cash on sale | | 0 | 78 |

Thus the Terre proposal would (1) yield $35,000 more on sale than the Kaushal proposal (line 5), but (2) require VREIT to finance $165,000 of the purchase price (line 7), and (3) produce no cash on sale as opposed to a $78,000 production of cash under the Kaushal proposal (line 9).

The discussion of the proposals revealed that Terre's broker reduced his fee from $65,000 to $50,000 to consummate the sales agreement but that no similar concession was asked of Kaushal's broker, and that the debtor's fix-up costs estimate ran from a high of $20,000 to a low of $15,000. The objecting parties argued that an accounting of the proposals should reflect these facts as well as the discount factor with respect to the present value of the $165,000 note. Such an accounting might read as follows:

IN THOUSANDS

| | Terre | Kaushal |
|---|---|---|
| 1) purchase price | 725 | 725 |
| 2) less: discount on note | 19.3* | – |
| 3) adjusted purchase price | 705.7 | 725 |
| 4) less: adjusted costs of sale | 50 | 67.5** |
| 5) net proceeds of sale | 655.7 | 657.5 |

* figured on the mean of the discount market offer rate and bid rate for 7 year U.S. Treasury notes on date of hearing, adjusted to 3 year life with 9% coupon.

** based on broker's fee adjusted to $50,000, and fix-up costs of $17,500 representing the mean of the fix-up costs estimate.

A major characteristic of the Terre deal is that it produces no cash on sale; the only cash generated by this sale goes to pay the

broker's fee. A consummation of the Kaushal deal, on the other hand, would in all probability produce cash on sale in the neighborhood of $100,000 (based on costs of sale as adjusted immediately above); such cash, were it obtained, might be used in distribution to unsecured creditors upon confirmation of VREIT's plan of reorganization. Thus, it appears to the Court that the position of the unsecured creditors would be prejudiced by a consummation of the Terre proposal when proposals such as that of Kaushal seem to be available in the current market. In any event, the court is of the opinion that VERIT should actively pursue the Kausahl offer and/or other offers to determine whether a transaction less prejudicial to the interests of the unsecured creditors might be consummated.

The court would like to see a sale of the property consummated but not through a sale which disadvantages unsecured creditors while protecting the interest of equity security holders. As a court of equity this forum is mindful that, in ruling on whether to permit the VREIT-Terre deal to go through, the interests of VREIT's equity holders must be balanced against the interests of VREIT's creditors in general and VREIT's unsecured creditors in particular. When it is realized that the discount on the $165,000 note is figured conservatively (at market for U.S. Treasury notes) and, alternatively, that the pay-down on a second mortgage is assured only when received, it becomes clear that the interest of VREIT's creditors would be better served at this time by VREIT's return to the marketplace and seller-buyer negotiating table than by VREIT's sale of the Colchester property to Terre Enterprises under the current proposal.

### ORDER

In accordance with the foregoing, it is ordered,

(1) that the sale of the Pearl Street property be and hereby is APPROVED; and

(2) that the sale of the Colchester property be and hereby is DISAPPROVED.